# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 17, 2021

## MELVIN R. KING, III v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 113599   Steven W. Sword, Judge**

_____

## No. E2021-00037-CCA-R3-PC
_____

The Petitioner, Melvin R. King, III, appeals the denial of his petition for post-conviction relief from his convictions and effective life sentence for first degree felony murder, aggravated burglary, employing a firearm during the commission of a dangerous felony, three counts of especially aggravated kidnapping, reckless aggravated assault, attempted especially aggravated robbery, and aggravated animal cruelty. The Petitioner alleges that trial counsel was ineffective for: (1) failing to pursue intoxication as a defense; (2) failing to file a motion to suppress the Petitioner's police statement because he was intoxicated when he gave it; (3) failing to adequately cross-examine a victim-witness who tampered with evidence at the crime scene and who gave an inconsistent prior statement; (4) failing to discuss the evidence tampering and inconsistent statement in closing argument; and (5) failing to poll the jurors to ensure they were not influenced by an improper communication from one of the jurors to the District Attorney General. In addition, the Petitioner argues that the cumulative effect of these errors deprived him of a fair trial. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JILL BARTEE AYERS, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Melvin R. King, III.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

The Petitioner's convictions stem from a botched robbery attempt at John Huddleston's Knoxville home on June 25, 2014, which resulted in Mr. Huddleston's ("the victim's") death. See State v. Melvin King, No. E2016-01043-CCA-R3-CD, 2017 WL 2242295, at *1 (Tenn. Crim. App. May 22, 2017), perm. app. denied (Tenn. Sept. 20, 2017). The Petitioner had four codefendants—Braylen Bennett, Roderick Curtis, Dwaine Love, and Charles Byrd. Codefendants Byrd and Curtis testified at trial. The proof at trial established that the victim was living with Daniel Nicely, Jerimiah Gilman, and Cody Hall; on the evening of the robbery, Mr. Nicely's girlfriend Sydney Smith was also at the home. In addition, the victim and Mr. Nicely each owned one dog. Mr. Nicely sold marijuana from the house and typically kept cash and marijuana there, sometimes in a small safe. Two days before the robbery, the Petitioner came to the house and spoke to Mr. Nicely about whether an unidentified woman lived there. Mr. Nicely, who did not know the Petitioner, responded negatively, and the Petitioner left.

Subsequently, on June 25, 2014, codefendant Byrd wanted to obtain marijuana to celebrate his getting a new job. King, 2017 WL 2242295, at *1. Codefendant Byrd, codefendant Love, codefendant Bennett, codefendant Curtis, the Petitioner, Brandon Phelps, and a person identified as "BJ" were together when the Petitioner suggested the victim's house as a place to get marijuana. The group planned to rob the people at the victim's house, and the Petitioner offered money to everyone who participated.

That evening, the victim, Mr. Nicely, Mr. Hall, Ms. Smith, and Mr. Gilman spent the evening watching television, during which a friend texted Ms. Smith and asked her how many people were at the house. King, 2017 WL 2242295, at *2. Later, Mr. Nicely and Ms. Smith retired to Mr. Nicely's bedroom, Mr. Hall fell asleep on the couch, and Mr. Gilman remained awake watching television.

The codefendants came to the house and attempted to enter through the back door; when someone answered the back door holding a gun, all of them entered the front door. King, 2017 WL 2242295, at *2. Mr. Hall awoke to a loud bang and Mr. Gilman's "flying across the room"; someone placed a silver gun to Mr. Hall's head and demanded to know where to find "dope." The person hit Mr. Hall four or five times in the head and told him to keep his head down. Mr. Hall eventually hid underneath a table, and he saw the men hitting Mr. Gilman. Someone told Mr. Gilman to unplug a Playstation console, and Mr. Hall heard the men threatening to shoot through one of the bedroom doors if the occupants refused to open it.

- 2 -

Meanwhile, Mr. Nicely heard yelling, loud noises, and "guys demanding stuff." King, 2017 WL 2242295, at *2. Ms. Smith heard three loud bangs in the front of the house. Mr. Nicely closed and locked the bedroom door after a man ran past, grabbed a .22-caliber rifle, looked for another firearm he owned, put the gun down, and braced himself against the door. A man with his face partially covered, whom Mr. Nicely identified as the Petitioner, broke down the door, placed a gun to Mr. Nicely's forehead, demanded dope, pointed the gun at Ms. Smith, and demanded "all [her] stuff." The Petitioner was distracted when the victim chased four or five of the men past the bedroom with a gun, during which time Mr. Nicely propped the door back up. Mr. Nicely and Ms. Smith remained in the bedroom bracing the door.

During this time, Mr. Hall was under a table in the living room. King, 2017 WL 2242295, at *2. He saw the men sit the victim down in a chair before they instructed Mr. Hall to keep his head down. Subsequently, the victim went into a hallway, and the men yelled that the victim had a gun. Mr. Hall and Mr. Gilman ran out of the house and heard multiple gunshots. Mr. Hall, Mr. Nicely, and Ms. Smith all averred that they did not see who fired the shots or who was hit by them. Mr. Curtis stated that he saw the Petitioner and the victim with guns in the hallway immediately prior to the shooting, but he never saw the victim fire his weapon.

After the shooting, Ms. Smith realized that she had been shot in the leg. King, 2017 WL 2242295, at *3. Mr. Nicely opened the bedroom door and found the victim, who had been shot in the head. Mr. Nicely's dog had also been shot and later succumbed to its injuries. The victim's dog was shot but survived. After Mr. Nicely yelled for help, he took a small safe from the kitchen table and put it "out in front next to the house" instead of immediately helping the victim. The safe contained marijuana and cash.

Mr. Hall was heading for a neighbor's house when he saw a group of people running down the street, and he returned to the house and provided first aid to the victim. King, 2017 WL 2242295, at *3. Mr. Nicely initially told the police that he did not sell drugs from the house, although he later admitted that he did.

Some of the codefendants fled the scene, but codefendant Byrd was left looking for a ride until codefendant Bennett drove back to the area with codefendant Curtis and the Petitioner about an hour after the incident to "recover evidence they left behind." King, 2017 WL 2242295, at *3. Shortly thereafter, the police stopped the car and arrested the four men. The police never located "BJ" or Mr. Phelps. Id. at *4.

Knox County Jail inmate John Hurst testified that when the codefendants arrived at the jail, the Petitioner told him that he had been arrested for a drug robbery "gone wrong" in which he shot someone five times, twice in the head and three times in the chest. King,

- 3 -

2017 WL 2242295, at *4. The Petitioner also disclosed that a woman and a dog had been shot. Of the twenty-five counts in the indictment, the jury acquitted the Petitioner of two counts of especially aggravated kidnapping by removing Mr. Gilman and Mr. Hall and one count of aggravated animal cruelty by seriously injuring the victim's dog. The jury convicted the Petitioner of the remaining counts, which the trial court merged as appropriate and ordered an effective life sentence.

On direct appeal, the Petitioner raised as issues the sufficiency of the evidence, the admissibility of the victim's autopsy photographs, and the propriety of a jury instruction on flight. King, 2017 WL 2242295, at *5-10. This court discerned no error and denied relief.

After our supreme court denied permission to appeal, the Petitioner filed a timely petition for post-conviction relief contending, in relevant part, that he received ineffective assistance of counsel because trial counsel failed to raise intoxication as a defense, failed to adequately cross-examine Mr. Nicely about tampering with evidence by moving the safe and impeach him with a prior inconsistent statement, and failed to request that a juror be removed after that juror, Robert Bowman, communicated with the District Attorney General during the trial. After post-conviction counsel was appointed, the Petitioner filed an amended post-conviction petition, which added an issue not relevant to this appeal.

At the post-conviction hearing, the Petitioner testified that before trial, he told trial counsel that the recording of his police interview reflected his telling the detective that he was intoxicated by marijuana and alcohol and needed "a second to sober [him]self." He noted that at trial, "they never touched upon . . . the mind state . . . [he] was in when [he] was interrogated or during . . . this alleged crime[.]" The Petitioner opined that his statement was inadmissible because he "wasn't in [his] right mind." He agreed that counsel did not assert an intoxication defense at trial. The Petitioner testified that due to his intoxication, he did not remember whether he was read his Miranda rights before the police interview. He stated that trial counsel reviewed the State's discovery materials with him and that he did not recall seeing a signed Miranda waiver form. Trial counsel did not raise as a pretrial issue the Petitioner's intoxication during the police interview.

Upon questioning by the post-conviction court, the Petitioner clarified that he was intoxicated during both the robbery and his police interview. The Petitioner agreed that his ineffective assistance claim related to trial counsel's failure to seek suppression of his police statement and counsel's failure to raise intoxication as a defense to guilt.

Relative to Mr. Nicely's cross-examination, the Petitioner testified that the first time Mr. Nicely identified him as having been involved "in any of the actions . . . during the case" was at trial. The Petitioner stated that at the preliminary hearing, Mr. Nicely did not

- 4 -

know who the Petitioner was aside from them having attended school together. The Petitioner said that he wanted trial counsel to "press further" into why Mr. Nicely knew who the Petitioner was "all of a sudden" and "all of these other things that [the Petitioner had] allegedly done." The Petitioner denied that trial counsel discussed Mr. Nicely's anticipated testimony with him. He said that trial counsel showed him a recording of Mr. Nicely's interview with a detective, in which the detective told Mr. Nicely that "he could charge him with a school zone, but he wouldn't if he cooperated." The Petitioner said that at trial, Mr. Nicely made a statement about "seeking justice; that he'll do whatever it takes[.]" The Petitioner opined that the statement "ruined the integrity of a fair trial" because the jury was "prejudiced and being biased toward the victim's side and making [the Petitioner] look like something [he] wasn't." The Petitioner said that trial counsel did not address the comment in closing arguments.

The Petitioner testified that Mr. Nicely admitted to removing "several items" from the home as the police secured the crime scene, including guns and a safe containing marijuana and money. The Petitioner noted that he had photographs showing that Mr. Nicely moved the items. The Petitioner opined that the tampering "ruined the integrity of the whole investigation."

The Petitioner testified that during trial, a juror communicated with the District Attorney General. He stated that even though the trial court held a hearing on the matter, he felt trial counsel should have "pressed harder" to have the juror removed. The Petitioner opined that the juror may have "tainted or persuaded other jurors to go along with his thoughts[.]" The Petitioner denied that trial counsel polled the other jurors about the juror at issue. The Petitioner stated that "either singularly or compounded," the complained-of errors contributed to an improper trial.

On cross-examination, the Petitioner testified that he did not remember whether he admitted to shooting the victim or asserted that he acted in self-defense in his police statement. The Petitioner stated that he was intoxicated and did not remember anything "from being arrested to waking up in the detention facility." He said that because he was intoxicated, he did not know whether he shot the victim. The Petitioner similarly did not remember calling anyone from the jail. He reiterated that he did not recall "the beginning stages of the charges and . . . the first few days." He agreed that his grandfather retained trial counsel to represent him.

The Petitioner testified that he may have met trial counsel once before the preliminary hearing, during which counsel explained what would happen at the hearing. He agreed Investigator Clayton Madison testified at the hearing that the Petitioner admitted to the shooting. The Petitioner said, "I don't remember if I said [it] to [trial counsel], but I know I said [it] to myself, I said, I don't remember admitting anything." He noted that he

was not "in the right frame of mind" and affirmed that he did not know whether he shot the gun.

The Petitioner testified that trial counsel reviewed the discovery materials with him, including his recorded police interview. The Petitioner acknowledged that he confessed to the shooting in the interview, but said that he could tell he was intoxicated and that he told trial counsel this observation. He explained, "I don't even sound like myself. I'm slurring my words. I wasn't in the right frame of mind to even be discussing such a heavy matter." The Petitioner again acknowledged his confession, but stated his belief that he did not shoot the victim. He theorized that he may have been "talking out of duress or fear" and that he did not know why he confessed. The Petitioner agreed that trial counsel also showed him the codefendants' police interviews, in which they identified the Petitioner as the shooter.

The Petitioner testified that he also reviewed the witnesses' police interviews. He stated, "We had all [grown] up together, dealt with each other on different levels, but that was as far as it went." The Petitioner said that he and codefendant Love had been at the victim's house earlier that week to purchase marijuana, and he acknowledged that one of the witnesses was able to identify the Petitioner at trial based upon the previous visit. The Petitioner acknowledged the Tennessee Bureau of Investigation report connecting shell casings at the crime scene to a gun in the Petitioner's possession; he said, though, "I had had that gun, but I didn't have it during this alleged crime."

The Petitioner testified that he and trial counsel discussed defense theories and the "possibilities of what [he] could face at trial." He agreed that they talked about self-defense and chose it as the defense theory. When asked why he chose self-defense, the Petitioner responded that one of the codefendants was shot and that the codefendant told him that they had been chased. The Petitioner averred, "But I felt that for me to do something so aggressively, it would have had to have been out of self-defense, because I'm not an aggressive person. And I may have felt threatened at the time, but like I said, I was inebriated."

A recorded jail telephone call between the Petitioner and his brother, Christopher Winton, was entered as an exhibit. In the recording, the Petitioner stated that he had been "set the f--k up" and asked Mr. Winton to call their mother and other family members because he needed a lawyer; he noted several times that unidentified people were trying to "kill" or "railroad" him. When Mr. Winton asked what had happened, the Petitioner stated, "I went over there to make a play, dude, and the m-----f---ers tried to rob me, I tried to run, I found a gun in the house, [I] f---ing shot that m-----f---er . . . cause he shot at me, bro." The Petitioner explained that he went to the house to sell a pound of marijuana, that the buyer pulled a gun on him, and that the Petitioner ran to the back of the house. The Petitioner stated that the person fired at him, that the Petitioner found another gun inside a

back room, and that the Petitioner returned fire when the person opened the door to the room. Mr. Winton asked if the assailant was "the girl or . . . the other dude," and the Petitioner said that it was the latter.

In the recording, the Petitioner said that the gunfire had "grazed" him and that the Petitioner believed he was going to die. The Petitioner denied knowing who set him up. He stated that he had to "shoot [his] way out [of] that g--d--n house." The Petitioner said that someone conveyed that he was facing fifty-one years in prison, and the Petitioner averred that he was "innocent" and acted in self-defense. The Petitioner said that he should have known he would be "hit" when "he" came looking for the Petitioner. He stated that people at the jail were treating him "dirty" because he "killed that d--n white boy." The Petitioner repeated that he acted in self-defense and said that "they [were not] trying to hear that." Mr. Winton stated that reports indicated the victim was shot in the head and the stomach. The Petitioner stated that he fired the gun with his eyes closed and that he did not know he hit the victim before he ran away.

A second man, whom the Petitioner identified as his grandfather, also spoke with him during the call. The Petitioner stated that a person, whose name was not audible, set him up for first degree murder. When the Petitioner's grandfather asked if he did the shooting, the Petitioner stated that the man shot at him first and that the Petitioner shot back in self-defense because he thought the man "was about to shoot and kill [him]." The Petitioner repeated the same general version of events he told Mr. Winton. The Petitioner's grandfather commented that he had heard another man did the shooting, and the Petitioner stated that this man was the one who shot at him. The Petitioner noted that the man "froze up" and that the Petitioner took the man's gun out of his hand because otherwise "[they] both would have been dead[.]"

At the post-conviction hearing, the Petitioner acknowledged his voice on the recording. He stated that he placed the call on the first or second day he was at the jail and that it was one of the first telephone calls he made. He agreed that he claimed self-defense during the call; he noted that "[a]s shocked as [he] sound[ed], [intoxication] probably wasn't on [his] mind at the time."

The Petitioner testified that he met with trial counsel three or four times before trial and that he did not recall what they discussed at the meetings. The Petitioner agreed that Mr. Nicely admitted to moving the safe during his trial testimony and that other witnesses testified as to the events inside the victim's house. The Petitioner acknowledged that codefendants Byrd and Curtis testified at trial and that their respective police statements had been recorded. The Petitioner averred that all of his "charge partners" could confirm that he was intoxicated at the time of the incident. When asked whether he was aware that the codefendants did not mention the Petitioner's intoxication in their police statements,

the Petitioner responded, "I'm pretty sure they wouldn't have been worried about that at the time[.]"  The Petitioner denied that he drove to the victim's house, although he did not know who drove his car.  He did not remember where his car was parked or whether he could walk to the house.  The Petitioner averred that he had spent the entire day smoking marijuana and drinking tequila and that all he remembered was that they were supposed to "go get some weed or take somebody some weed[.]"  He agreed that he did not recall whether he went to the house or entered the house.  The Petitioner stated, though, that he would have remembered kicking in the front door and that he did not believe he did such.  He noted that based upon the trial testimony he remembered, there was no photographic evidence of forced entry.

The Petitioner testified that Mr. Nicely was larger than the Petitioner and that if Mr. Nicely was bracing a door, it was not possible for the Petitioner to have broken it down.  He similarly denied the possibility that he could have broken down the victim's bedroom door.

Relative to Mr. Bowman, the Petitioner acknowledged that the matter was handled on the record, but he stated that although Mr. Bowman affirmed that he would uphold his duties, the Petitioner felt that trial counsel should have pushed to have him excused.  The Petitioner opined that "his credibility had been tainted by him reaching out to the head DA" and that the situation caused a conflict of interest.  The Petitioner stated that he felt it was "too risky" for Mr. Bowman to remain on the jury and that if trial counsel "wouldn't remove him," the Petitioner intended to raise the issue on appeal.  The Petitioner agreed that Mr. Bowman attended church with the District Attorney General and that his email to her conveyed that he was sitting on a jury.  The Petitioner affirmed that neither Mr. Bowman nor any jurors testified regarding the jury's having been tainted by Mr. Bowman's presence, and the Petitioner said that he "just felt that it tampered with [his] due process right[s]."

Trial counsel testified for the State that he had been practicing law since 1985, primarily in criminal defense.  Counsel had tried more than twenty cases before he represented the Petitioner, including some murder cases.  He was retained by the Petitioner's family.  Although counsel did not recall many details of this case, he remembered reviewing the evidence with the Petitioner.  Counsel did not think that the Petitioner was amenable to entering a guilty plea because of his self-defense claim.  Counsel noted that the evidence consisted of witness statements, photographs, and a quantity of forensic evidence, including bullet trajectories inside the house.  Counsel did not recall speaking to the prosecutor on the morning of trial to negotiate a plea agreement after one of the codefendants had pled guilty.

When asked if the Petitioner's case was difficult to defend, trial counsel responded that the Petitioner "was in a position where the victim picked up a gun from the living room that nobody knew was there . . . [and] came down the hallway in an aggressive situation." Counsel noted that "it was difficult to go through . . . who shot first and why and where" and that he understood the Petitioner's raising self-defense based upon the evidence. Counsel did not recall the Petitioner's telling him about his having been intoxicated during the incident but did not deny the possibility that he did.

On cross-examination, trial counsel testified that he did not recall whether he filed a motion to suppress the Petitioner's police statement based upon his intoxication. Counsel similarly did not recall an issue involving Miranda warnings before the police interview. Although counsel did not remember the Petitioner's recorded jail telephone call, he stated that if the State provided the recording in discovery, counsel would have listened to it and discussed it with the Petitioner. Counsel did not recall whether he played the recording for the Petitioner. Counsel apologized for his general lack of memory and stated that he had not reviewed the Petitioner's file before the hearing.

The post-conviction court issued a November 30, 2020 written order denying post-conviction relief. The court found that trial counsel was a "very experienced attorney" who had tried numerous criminal cases, including homicides, before he represented the Petitioner. The court found generally that the Petitioner's case was difficult to defend given the overwhelming evidence of his guilt. The court found that trial counsel investigated, discussed potential defense theories, and pursued self-defense in accordance with the Petitioner's police statement and jail telephone call.

The post-conviction court discredited the Petitioner's post-conviction hearing testimony that he was intoxicated and did not remember the shooting or his police interview. The court noted that the Petitioner's "self-serving" police statement was not introduced at trial, although a police officer testified at the preliminary hearing that the Petitioner had confessed. The court stated that the recorded jail telephone call, which occurred immediately after the shooting, demonstrated that the Petitioner remembered "exactly" what happened and that he discussed self-defense, not intoxication.

The post-conviction court found that "[a]lthough [trial counsel]'s memory regarding his representation of [the Petitioner] was certainly not complete," counsel would have remembered the Petitioner's telling him that he did not remember giving his police statement. The court noted counsel's testimony that he did not recall the Petitioner's ever discussing intoxication with him, as well as the Petitioner's testimony that he did not remember telling counsel about the Petitioner's being intoxicated during his incriminating police statement. The court found that other than the Petitioner's incredible post-conviction testimony, he had never "hinted" at an intoxication issue. The court noted that

self-defense had "some basis in fact" from which trial counsel could argue. The court found that pursuing self-defense was a reasonable defense theory chosen after the investigation and that counsel was not deficient in this regard. The court noted that had counsel pursued an intoxication defense, the Petitioner might have a stronger case for ineffective assistance.

Relative to Mr. Nicely's cross-examination, the post-conviction court found that the trial record[1] belied the Petitioner's claim that trial counsel failed to cross-examine him. Counsel probed into Mr. Nicely's initial denial that he knew the shooter on cross and recross-examination, and Mr. Nicely's actions at the crime scene after the shooting were discussed on direct and cross-examination. The court noted that the Petitioner did not elaborate on what other questions counsel should have asked Mr. Nicely.

Relative to Mr. Bowman, the post-conviction court found that the Petitioner had not shown that the "possible connection" with the District Attorney General made Mr. Bowman unable to be fair and impartial. The court noted that although trial counsel did not request Mr. Bowman's removal, no evidence had been presented at the post-conviction hearing that Mr. Bowman was unfair to the Petitioner. The court observed that neither party asked counsel about any tactical reasons for counsel's decision in this regard. The court found that any such motion would have been denied and that counsel was not deficient for failing to raise a futile motion. The court noted that the Petitioner presented no proof that Mr. Bowman was not impartial and concluded that no prejudice resulted.

The post-conviction court denied relief. The Petitioner timely appealed.

## ANALYSIS

On appeal, the Petitioner alleges that trial counsel was ineffective for: (1) failing to pursue intoxication as a defense; (2) failing to file a motion to suppress the Petitioner's police statement on the grounds that he was intoxicated when he gave it; (3) failing to adequately cross-examine Mr. Nicely; (4) failing to discuss Mr. Nicely's evidence tampering and prior inconsistent statement in closing argument; and (5) failing to poll the jurors to ensure they were not influenced by the improper email Mr. Bowman sent to the District Attorney General. In addition, the Petitioner argues that the cumulative effect of these errors deprived him of a fair trial. The State responds that counsel was not deficient and that the Petitioner has waived his cumulative error claim for failure to raise it in the court below.

---

[1] The trial record was exhibited to the post-conviction hearing.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). We apply the Strickland test to claims of ineffective assistance of trial counsel as well as ineffective assistance of appellate counsel. Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)).

- 11 -

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

As a preliminary matter, the Petitioner raises as a separate issue the post-conviction court's credibility determinations, noting trial counsel's "stunning lack of memory (or interest) regarding his actions or lack thereof during the trial" and stating that the post-conviction court

> should have more carefully considered the demeanor of, and the lack of contradictory substantive testimony by, trial counsel . . . and that giving any weight whatsoever to the testimony of trial counsel below was error by the post-conviction court. Consequently, the testimony of your [Petitioner] should have been deemed sufficient to show by clear and convincing evidence that he was entitled to relief on his Petition.

This court is bound by the post-conviction court's credibility determinations unless the evidence in the record preponderates against them. Although trial counsel's preparation for the post-conviction hearing was less than desirable, counsel's lack of memory does not give this court authority to substitute our judgment for that of the finder of fact regarding credibility. See Fields, 40 S.W.3d at 456. The Petitioner is not entitled to relief on this basis.

## I. Intoxication Defense

The Petitioner contends that trial counsel rendered ineffective assistance by failing to raise an intoxication defense at trial; he argues that counsel should have "bolster[ed] the defense theory with tangible proof that [the Petitioner] was intoxicated at the time of the shooting[.]" The State responds that counsel pursued a reasonable theory of self-defense and that no prejudice resulted.

Relative to any alleged failure of trial counsel to obtain or introduce evidence that the Petitioner was intoxicated, a post-conviction petitioner must present at the post-

conviction hearing any evidence that would have been presented to the jury but for trial counsel's alleged deficiency. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The Petitioner did not allege that any evidence of his intoxication existed other than his police statement, which was not in the trial record and which he did not present to the post-conviction court. The Petitioner is not entitled to relief on this basis.

Relative to the defense theory, the trial record does not contain any indication that the Petitioner was under the influence of drugs or alcohol to a notable degree at the time he was arrested and interviewed. The officer who arrested the Petitioner testified about codefendant Curtis's graze wound and the codefendants' general cooperation with his commands during a traffic stop and did not convey any observations about the codefendants' respective demeanors.

At the post-conviction hearing, trial counsel testified that he chose a self-defense strategy based upon the Petitioner's version of events, and counsel noted that he understood why the Petitioner argued self-defense given the evidence. The recording of the jail telephone call reflects that the Petitioner repeatedly insisted to his family that he acted in self-defense. At no point did the Petitioner claim not to remember the relevant events or state that he was intoxicated; in fact, he told his brother and his grandfather almost identical stories about how the victim pulled a gun on him during a drug deal, forcing the Petitioner to shoot him after the victim chased the Petitioner to a back room that contained a gun. At the post-conviction hearing, the Petitioner could not recall whether he told counsel that he did not remember confessing to the shooting. The post-conviction court discredited the Petitioner's assertion that he told counsel that he appeared to be intoxicated in the recorded police interview. Again, the Petitioner did not exhibit a copy of the recording to the hearing.

We note, though, that the post-conviction court's finding that trial counsel would have remembered if the Petitioner told him that he did not recall confessing to the police is not supported by the record. Trial counsel testified only that he did not remember the Petitioner's discussing intoxication, although counsel allowed the possibility that may have done such, and that he did not recall filing a motion to suppress the Petitioner's statement because he was intoxicated when he gave it.

Nevertheless, the record supports the post-conviction court's finding that counsel chose a reasonable defense strategy based upon the evidence available at the time. Counsel was not deficient for failing to pursue a defense theory that was not raised by his conversations with the Petitioner or the discovery materials. Cf. Wiley v. State, 183 S.W.3d 317, 332 (Tenn. 2006) (holding that trial counsel was deficient for failing to investigate and assert self-defense when the petitioner consistently told police and counsel

that he and the victim argued, that the victim "rushed" him, and that he and the victim fell into a dresser). The Petitioner is not entitled to relief on this basis.

## II. Motion to Suppress

The Petitioner argues that trial counsel provided ineffective assistance by failing to seek suppression of his police statement, arguing that he was intoxicated when he gave it. The State responds that counsel was not deficient in this regard.

We note that the post-conviction petition, as amended, did not raise a separate issue regarding trial counsel's failure to file a motion to suppress the Petitioner's police statement due to his intoxication. However, the Petitioner clearly raised the issue during his post-conviction hearing testimony. The post-conviction court did not address the motion to suppress issue in its order other than noting that the Petitioner's "self-serving" police statement was not introduced at trial.

Trial counsel had no memory of filing a motion to suppress the Petitioner's police statement due to his intoxication, and the trial record reflects that no motion to suppress was filed in this case.[2] No evidence in the record speaks to whether any such motion would have been successful, and the Petitioner did not provide the post-conviction court with any evidence of his intoxication that should have been presented, see Black, 794 S.W.2d at 757. Nonetheless, the Petitioner was not prejudiced by any failure to file a motion to suppress because the police statement was not introduced into evidence at trial. The Petitioner is not entitled to relief on this basis.

## III. Cross-Examination of Mr. Nicely

The Petitioner argues generally that trial counsel provided ineffective assistance during his cross-examination of Mr. Nicely. The Petitioner stated that Mr. Nicely "was not asked on cross-examination how [Mr.] Nicely could testify that he knew [the Petitioner] well, and could testify about [the Petitioner's] actions[.]" We interpret this sentence as referring to Mr. Nicely's ability to recognize or identify the Petitioner as the perpetrator. The Petitioner further states that counsel failed to impeach Mr. Nicely about his having removed a gun and his safe from the crime scene, "thereby ruining the integrity of the crime scene." The State responds that trial counsel inquired into both issues at trial.

---

[2] Trial counsel did file a September 3, 2015 motion to join in codefendant Bennett's "Motion to Compel Disclosure of Redacted Statements or, in the Alternative, Motion to Exclude Statements." Codefendant Bennett's motion is not included in the Petitioner's trial record.

Although the Petitioner avers in his brief that his testimony "about Nicely's admission that he removed potential evidence from the crime scene . . . [and] mov[ed] items in the house, thereby ruining the integrity of the crime scene, and trial counsel's failure to impeach Nicely in this regard . . . went unchallenged at the post-conviction hearing," the trial transcript belies this claim. Trial counsel questioned each victim-witness regarding Mr. Nicely's safe and their familiarity with it. On direct examination, Mr. Nicely testified that after the shooting, he took his small safe from the kitchen table to the bushes in front of the house before coming back to aid the victim. Mr. Nicely acknowledged that he sold marijuana and that the marijuana and cash inside the safe were his.

On cross-examination, trial counsel first asked Mr. Nicely whether he lied to the police at the beginning of their investigation, which Mr. Nicely confirmed. He also acknowledged that he told the police that he would do "[w]hatever it took" to convict "these people." Mr. Nicely agreed that he initially told police that he did not know who was standing outside his bedroom door, that he did not know the other men, and that he did not know who shot the victim because he did not see the shooting. Trial counsel questioned Mr. Nicely's actions after the shooting, including asking, "This is your brother – as you say, like a brother, laying there, but your marijuana was more important, right, get it out of the house?" When Mr. Nicely disputed that the marijuana was more important, counsel emphasized that Mr. Nicely took the marijuana out of the house, threw it into the bushes, then returned to help the victim. Counsel also elicited from Mr. Nicely that he hid evidence. Mr. Nicely explained that he "didn't want anything to jeopardize [his] buddy getting justice served." Mr. Nicely denied unloading a .45-caliber pistol from the victim's bedroom to make it look as though the victim had not fired it.

Relative to Mr. Nicely's familiarity with the Petitioner, Mr. Nicely testified that during the robbery, he recognized the man who held him at gunpoint as the same man who came to the house two days previously. Trial counsel asked several questions on this point, as his answers were initially ambiguous. Mr. Nicely clarified that he learned this man was the Petitioner when he identified the Petitioner's photograph in a lineup. Trial counsel further questioned Mr. Nicely about how he could recognize the Petitioner during the robbery when the Petitioner's face was covered.

On recross-examination, Mr. Nicely admitted to lying to the police at the crime scene by claiming not to know who sold marijuana at the house. Mr. Nicely acknowledged a portion of his police interview in which an officer said that he could prosecute Mr. Nicely with marijuana-related offenses in a school zone. Mr. Nicely denied, however, that the possible drug charges influenced his decision to testify. Mr. Nicely stated that he did not get charged "[b]ecause [he] said [he would] do anything [he had] to do to make sure he's convicted." On redirect examination, Mr. Nicely denied that the prosecutor had made him an offer or promise, directly or indirectly, in exchange for his testimony. Mr. Nicely noted

that he was "just trying to get justice for [his] friend" and did not care whether he was charged. On recross-examination, Mr. Nicely acknowledged that an officer on the scene indicated that he would not charge Mr. Nicely, although he could do such and was angry with Mr. Nicely for lying to him. Mr. Nicely averred that he was truthful with the police and the jury about what happened inside the house during the robbery.

The record supports the post-conviction court's determination that trial counsel was not deficient in his cross-examination. Both parties elicited from Mr. Nicely that he was involved in drug dealing and moved evidence at the crime scene. Counsel's cross-examination placed Mr. Nicely's credibility at issue, especially whether his stated desire to seek justice for the victim was sincere in light of the fact that he tampered with evidence before helping the victim. Counsel also questioned Mr. Nicely's ability to identify the Petitioner. We note that the Petitioner has not alleged what further cross-examination of Mr. Nicely would have revealed. Trial counsel was not deficient in this regard, and the Petitioner is not entitled to relief on this basis.

### IV. Closing Argument

The Petitioner notes in his brief that trial counsel failed to argue in closing that Mr. Nicely did not know the Petitioner well enough to be able to identify him. Closing arguments were not transcribed in the trial record. However, this issue was not raised in the post-conviction petition; the Petitioner's only comment about closing arguments at the post-conviction hearing related to the perceived unfairness of Mr. Nicely's having testified that he sought justice for the victim, not Mr. Nicely's familiarity with the Petitioner; the post-conviction court made no findings relating to this issue in its order; and the Petitioner has not set out a factual or legal argument aside from a portion of one sentence in his brief.[3] Insomuch as the Petitioner has raised trial counsel's effectiveness during closing arguments as a separate issue, it has been waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); Tenn. R. Ct. Crim. App. 10(b)("Issues which are not supported by argument . . . will be treated as waived in this court").

### V. Improper Juror Communication

The Petitioner contends that trial counsel was ineffective for "fail[ing] to make inquiry of the petit jury panel whether they had been improperly influenced by" Mr. Bowman's email to the District Attorney General. The State responds that the trial court

---

[3] We note that apart from a paragraph of block quotes articulating the standard of review, the Petitioner's statement of applicable law is two sentences in length.

found after a hearing that Mr. Bowman showed no bias or impartiality and that the Petitioner did not question trial counsel about Mr. Bowman at the post-conviction hearing. Consequently, the State asserts that the Petitioner did not carry his burden of establishing that trial counsel's alleged decision not to address the matter further was not tactical.

The trial record reflects that on October 14, 2015, the third day of trial, Mr. Bowman sent the following email to District Attorney General Charme Allen's personal email account:

> I'm 68 years old and serving on a jury for first time this week, in Steve Sword's court. Quite an experience, both educationally and emotionally. Hoping to conclude by Friday. Knew it was a long shot but was hoping I might run into you this week. I think of our Katrina and LRPTF days occasionally, and when I do, I pray for you and your ministry of justice. Be Well. RWB

The next morning before the jury returned to the courtroom, the trial court called Mr. Bowman to the courtroom, and the following exchange occurred:

THE COURT: Good morning, Mr. Bowman.

JUROR BOWMAN: Good morning.

THE COURT: I just want to--before we continue with the case today, I just wanted to ask you a question. I understand that you know our elected attorney general who is the boss of Ms. Fitzgerald, Ms. Allen now, used to be Charme Knight. Do you think that your previous relationship with her would create any difficulty in you being fair and impartial in this case?

JUROR BOWMAN: No, sir.

THE COURT: So if you felt like the state had not met its burden of proof, you would have no-- hesitancy at all, due to your relationship with Ms. Allen, to vote not guilty, I take it?

JUROR BOWMAN: Yes.

THE COURT: General, do you have any questions for Mr. Bowman?

MS. FITZGERALD: No.

- 17 -

THE COURT: [Trial counsel], do you have any questions?

[TRIAL COUNSEL]: I take it that when you sent that e-mail you thought that would--there was no problem doing that.

JUROR BOWMAN: Obviously not.

[TRIAL COUNSEL]: I guess this is more of a learning experience than you imagined, right?

JUROR BOWMAN: It already is.

[TRIAL COUNSEL]: So you can be fair and impartial in this case, correct?

JUROR BOWMAN: Yes, sir.

[TRIAL COUNSEL]: Thank you.

THE COURT: All right. So, Mr. Bowman, just don't have any more contact with Ms. Allen for the next couple days, and you'll be good. Okay?

JUROR BOWMAN: I apologize.

THE COURT: All right. If you'd go back and join your fellow jurors, we'll bring you in here in just two seconds.

(Juror Bowman left the courtroom.)

THE COURT: Anybody have a motion?

MS. FITZGERALD: No, sir.

THE COURT: You okay?

[TRIAL COUNSEL]: (Indicated in the affirmative.)

We note that the post-conviction petition only raises this issue in the context of trial counsel's failure to seek removal of Mr. Bowman from the jury. The post-conviction court's order addresses the issue as raised in the petition. However, the Petitioner's brief only addresses trial counsel's failure to poll the remaining jurors and does not contain any reference to Mr. Bowman's removal from the jury. The State's appellate brief addresses

the removal issue, although it also includes a brief argument regarding trial counsel's failure to poll the remaining jurors.

Relative to the alleged failure to poll the jury about Mr. Bowman, the Petitioner may not raise an issue for the first time on appeal, and it is waived. See Tenn. R. App. P. 36(a). Relative to the alleged failure to remove Mr. Bowman from the jury, issues not supported by argument in the appellate brief are deemed by this court to have been waived. See Tenn. R. Ct. Crim. App. 10(b).

However, the record supports the post-conviction court's determination that trial counsel was not deficient. The Petitioner failed to present any evidence to the post-conviction court that Mr. Bowman or the other jurors were biased against him as a result of Mr. Bowman's actions. The Petitioner is not entitled to relief on this basis.

*VI.    Cumulative Error*

The Petitioner contends that the cumulative effect of trial counsel's deficiencies deprived him of a fair trial. The State responds that this issue has been waived for failure to raise it in the court below.

The record reflects that other than a passing remark during the Petitioner's post-conviction testimony that "either singularly or compounded," he felt the complained-of errors contributed to an improper trial, the State correctly notes that the Petitioner never raised cumulative error in his petition or as a separate issue, and the post-conviction court did not address it in its order. It has consequently been waived. See Tenn. R. App. P. 36(a). In any event, we have concluded that no individual errors occurred, and as a result, no cumulative error exists. The Petitioner is not entitled to relief on this basis.

## CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
D. KELLY THOMAS, JR., JUDGE